# Civil Action No. 07-CV-01305-EWN-CBS

# Respondent's Exhibit A

FEB 2 1

| | |
|---|---|
| COURT OF APPEALS, STATE OF COLORADO<br><br>Colorado State Judicial Building<br>Two East 14th Avenue<br>Denver, Colorado 80203 | |
| Denver District Court<br>Honorable Shelley I. Gilman, Judge<br>Case Number 98CR5061 | |
| THE PEOPLE OF THE STATE OF COLORADO<br><br>Plaintiff-Appellee<br><br>v.<br><br>Stephen Martinez<br><br>Defendant-Appellant | ▲ COURT USE ONLY ▲ |
| David S. Kaplan, Colorado State Public Defender<br>JAMES GRIMALDI, #24893<br>110 16th Street, Suite 800<br>Denver, Colorado 80202<br><br>Appellate.defenders@state.co.us<br>(303) 620-4888 (Telephone) | Case Number: 00CA312 |
| **OPENING BRIEF OF DEFENDANT-APPELLANT** | |

## TABLE OF CONTENTS

Page

INTRODUCTION ..........................................................................................................1

STATEMENT OF THE ISSUES PRESENTED..........................................................1

STATEMENT OF THE CASE......................................................................................1

STATEMENT OF THE FACTS ...................................................................................2

SUMMARY OF THE ARGUMENT ...........................................................................7

ARGUMENT

I.    THE    DISTRICT    COURT    VIOLATED    MR.    MARTINEZ'
CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND REVERSIBLY ERRED
BY PERMITTING EXPERT TESTIMONY CONCERNING "KNOWN FACT
PATTERNS" IN WHICH SUBDURAL HEMATOMAS HAVE BEEN CAUSED
BY FALLS FROM MULTI-STORY BUILDINGS OR HIGH-SPEED
AUTOMOBILE ACCIDENTS, AS PROOF THAT MR. MARTINEZ USED
SUCH A DEGREE OF FORCE AND THUS CAUSED HEATHER'S DEATH
KNOWINGLY........................................................................................................8

    A.    Pertinent facts: ..........................................................................................8

    B.    Application to the law:............................................................................11

        1. The court erred by admitting the challenged testimony........................11

        2. The error was extraordinarily prejudicial, and thus reversible. ............16

II.    THE PROSECUTION'S INTENTIONAL AND CYNICAL USE OF
INCONSISTENT POSITIONS TO MANIPULATE THE TRIAL VIOLATED
MR. MARTINEZ' CONSTITUTIONAL RIGHT TO DUE PROCESS AND A
FAIR TRIAL. ......................................................................................................19

III.    C.R.S. SECTION 18-6-401 VIOLATES THE CONSTITUTIONAL
GUARANTEE OF EQUAL PROTECTION BY ESTABLISHING DISPARATE
CLASS-1 AND CLASS-2 PUNISHMENTS FOR IDENTICALLY SITUATED
OFFENDERS, BASED ON THE PURELY NORMINAL DISTINCTION OF
"POSITION OF TRUST" STATUS..................................................................21

IV.    ASSUMING *ARGUENDO* THAT THE GENERAL ASSEMBLY DOES
NOT VIOLATE EQUAL PROTECTION GUARANTEE BY PREDICATING
DISPARATE PUNISHMENTS ON THE PURELY NOMINAL "POSITION OF
TRUST" DISTINCTION, THE GENERAL ASSEMBLY VIOLATES EQUAL
PROTECTION BY PREDICATING DISPARATE PUNISHMENTS ON THE
BASIS OF AN IRRATIONAL AND IMPERMISSIBLE DISTINCTION
BETWEEN DIFFERENT CLASSES OF CHILDREN. .................................26

CONCLUSION.............................................................................................................29
CERTIFICATE OF SERVICE ..................................................................................29

## TABLE OF CASES

Arizona v. Fulminante,
    499 U.S. 279 (1991)..............................................................................17

Blecha v. People,
    962 P.2d 931 (Colo. 1998)......................................................................17

Brady v. Maryland,
    373 U.S. 83 (1963)................................................................................20

Calderon v. Thompson,
    523 U..S. 538 (1998).............................................................................21

Chapman v. California,
    386 U.S. 18 (1966)...............................................................................17

Drake v. Kemp,
    762 F.2d 1449 (11th Cir. 1985) ........................................................20

Estate of Burford v. Burford,
    935 P.2d 943 (Colo. 1997).....................................................................21

Farmers High Line Canal v. City of Golden,
    975 P.2d 189 (Colo. 1999).....................................................................21

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999)..........................................................................12,15

Lyons Savings v. Dire's Lock,
    885 P.2d 345 (Colo. App. 1994).............................................................21

Montana v. Egelhoff,
    518 U.S. 37 (1996)...............................................................................16

People v. Calvaresi,
    188 Colo. 277, 534 P.2d 316 (1975).......................................................22

People v. District Court,
    632 P.2d 1022 (Colo. 1981)...................................................................20

People v. Drake,
    841 P.2d 364 (Colo. App. 1992).............................................................20

People v. Haymaker,
    716 P.2d 110 (Colo. 1986).................................................................22,26

People v. Marcy,
        628 P.2d 69 (Colo. 1981)......................................................................22,25

People v. Mozee,
        723 P.2d 117 (Colo. 1986)........................................................................22

People v. Nord,
        790 P.2d 311 (Colo. 1990)........................................................................17

People v. Nguyen,
        900 P.2d 37 (Colo. 1995)......................................................................22,25

People v. Quintana,
        665 P.2d 605 (Colo. 1983)........................................................................11

People v. Stewart,
        ___ P.2d ___ (Colo. App. June 22, 2000)..............................................22,25

People v. Suazo,
        867 P.2d 161 (Colo. App. 1993)................................................................26

People v. Wilhem,
        676 P.2d 702 (Colo. 1984)....................................................................22,25

Romer v. Evans,
        517 U.S. 620 (1996)..................................................................................27

Salcedo v. People,
        ___ P.2d ___ (Colo. 2000)........................................................................12

Schultz v. Wells,
        ___ P.3d ___ (Colo. App. 17, 2000).........................................11,12,14,15

Singer v. United States,
        380 U.S. 24 (1965)....................................................................................20

Sullivan v. Louisiana,
        508 U.S. 275 (1993)..................................................................................17

Thompson v. Calderon,
        120 F.3d 1045 ...........................................................................................21

## TABLE OF STATUTES AND RULES

Colorado Revised Statutes
 Section 18-1-501(3) ...........................................................................................8
 Section 18-1-501(6) ...........................................................................................4
 Section 18-1-501(8) ...........................................................................................5
 Section 18-3-102(1)(f) ............................................................................1,22,23
 Section 18-6-401 ...................................................................................1,7,22,23
 Section 18-6-401(7)(a)(I) ..............................................................................23,24
 Section 18-6-401(7)(c) .................................................................................1,4,8
 Section 19-1-103(1) ........................................................................................28

Colorado Rules of Evidence
 Rule 401 ....................................................................................................11,16
 Rule 402 ....................................................................................................11,16
 Rule 403 ....................................................................................................11,12
 Rule 702 .................................................................................................12,15,16

## CONSTITUTIONAL AUTHORITIES

United States Constitution
 Amendment V ..............................................................................................16,21
 Amendment XIV ..........................................................................................16,21

Colorado Constitution
 Article II, Section 25 ....................................................................................16,21

## OTHER AUTHORITIES

American Bar Association Standards for Criminal Justice,
 Standard 3-12(c) ...............................................................................................20

## INTRODUCTION

Mr. Stephen Martinez, the Defendant-Appellant, was the defendant in the trial court and will be referred to by name or as the Defendant. Plaintiff-Appellee, the State of Colorado, will be referred to as the prosecution or the State. Numbers in parentheses refer to the volume and page number of the record on appeal.

## STATEMENT OF THE ISSUES PRESENTED

I.       Whether the district court violated Mr. Martinez' constitutional right to a fair trial and reversibly erred by permitting expert testimony concerning "known fact patterns" in which subdural hematomas have been caused by falls from multi-story buildings or high-speed automobile collisions, as proof that Mr. Martinez used such a degree of force and thus caused Heather's death knowingly?

II.      Whether the prosecution's intentional and cynical use of inconsistent positions to manipulate the trial violated Mr. Martinez' constitutional right to due process and a fair trial?

III.     Whether C.R.S. section 18-6-401 violates the constitutional guarantee of equal protection by establishing disparate class-1 and class-2 felony punishments for identically situated offenders, based on the purely nominal "position of trust" distinction?

IV.      Whether, assuming *arguendo* that C.R.S. section 18-6-401 does not violate equal protection guarantee by predicating disparate punishments on the purely nominal "position of trust" distinction, the statute violates equal protection by predicating disparate punishments on the basis of an irrational and impermissible distinction between different classes of children?

## STATEMENT OF THE CASE

The prosecution charged Mr. Martinez with child abuse resulting in death, as a class-1 felony, *see* C.R.S. §§ 18-3-102(1)(f); 18-6-401(7)(c).(v1, 1) Mr. Martinez pleaded not guilty and

1

tried his case to a jury. At conclusion of trial, the jury returned a verdict of guilty.(v1, 99) At a sentencing hearing held January 7, 2000, the court imposed a sentence of life in prison without possibility of parole, as required by statute.(v1, 102) It is this judgment and sentence from which Mr. Martinez now directly appeals.

## STATEMENT OF THE FACTS

Mr. Martinez, the defendant in this case, called 911 on the day in question to report an emergency involving four-month-old Heather Mares.(People's Ex. 4) In discussions with the 911 operator, Mr. Martinez reported that Heather had begun choking after he fed her a bottle of baby formula.(People's Ex. 4) He explained that the child was choking and pale and that her temperature was growing cold.(People's Ex. 4)

During the 911 call, Mr. Martinez exclaimed, "I need someone here like right now."(People's Ex. 4)

When paramedics arrived, they discovered that Heather Mares was in grave condition, and removed her to an emergency hospital.(v8, 278-81) Police were also on hand, in an effort to investigate whether Heather had suffered from child abuse.(v8, 327-42) The home was tidy and well kept, but police noticed that Heather's crib sheet was missing.(v8, 337) Mr. Martinez informed police that he had placed the sheet in the washing machine because it was marked with blood.(v8, 337)

He seemed distraught, depressed, and his eyes welled with tears.(v8, 343-44) He likewise cried when discussing the catastrophe with Heather's mother, Kim Velverde.(v8, 411)

Before leaving the scene, police solicited statements and written reports from Mr. Martinez and Ms. Velverde.(v8, 342) Mr. Martinez is not Heather's father, but rather, he was Ms. Velverde's boyfriend.(v8, 338) Mr. Martinez was caring for Heather on this morning while

2

Ms. Velverde ran an errand.(v8, 424)  Ms. Velverde returned home just as the paramedics were arriving.(v8, 430)

In Mr. Martinez' oral and written statement to an investigating officer, he reiterated essentially what he had told the 911 operator, which is that Heather began choking after he had left her with her bottle.(v8, 319)  Police, however, were skeptical of this account, partly because of the blood on Heather's bed sheet.

Heather died later that day, and the coroner's report indicates that she had in fact suffered a skull fracture, localized subdural hemorrhage, and nerve damage.(People's Ex. 32)  The report also indicates symptoms of historical "acceleration/deceleration" injury to the brain.(People's Ex. 32)  Heather's death, the coroner's report indicates, was "due to complications from blunt trauma to the head."(People's Ex. 32)

Later in the day police arrested Mr. Martinez and subjected him to a videotaped interrogation.[1]  During this interrogation, Mr. Martinez reiterated the account that he had given previously.(People's Ex. 35 & 36, pp. 1-40)  He added his opinion that Heather's death might have happened as a delayed result of an accident a couple of weeks earlier, in which he had been feeding Heather and tripped, causing what he had previously thought was a minor head wound.(People's Ex. 35 & 36, pp. 1-40)

The interrogating detective, however, expressed displeasure with this account and, after assuring Mr. Martinez that accidents happen, and that he could receive "help" in the form of

---

[1] Let it be noted that Mr. Martinez' trial attorneys did not raise constitutional challenges to the legality, voluntariness or admissibility of any of Mr. Martinez' spoken, written, or taped statements.  For this reason and no other, such challenges are not raised in this appeal.  This should not be construed as a wavier by undersigned counsel on the merits.  Counsel sees several potential claims, all of which would require testimony and investigation beyond the facts of the appellate record.  This appeal is taken without prejudice to Mr. Martinez' right to address such constitutional claims in a post-conviction proceeding.

counseling or a sentence to probation if he were to admit having wrongly caused Heather's death, Mr. Martinez made new admissions.(People's Ex. 35 & 36, pp. 40-70)  Specifically, he reported that on the day in question he had grown exasperated by the baby's crying and thus shaken her with a degree of vigor that could have been foreseeably dangerous.(People's Ex. 35 & 36, pp. 40-70)  He acknowledged that during this episode Heather's head struck her crib forcefully, albeit accidentally.(People's Ex. 35 & 36, pp. 40-70)

After making these admissions, Mr. Martinez expressed remorse for his conduct, for the imminent loss of his relationship with Kim Velverde, and for the loss of Heather's innocent life.(People's Ex. 35 & 36, pp. 86-88)  He longs for a chance to show people that he is not an evil person.(People's Ex. 35 & 36, p. 88)

Indeed, he is not.  Other than this incident, Mr. Martinez has no criminal history.(v9, 591) He was also gainfully employed by RTD at the time in question, and he had helped Ms. Velverde maintain a household that witnesses described as orderly and clean.(People's Ex. 36, at 59-60) The parties stipulated that, outside of this charged incident, Mr. Martinez has never at any time been involved domestic violence.(v1, 89)

The prosecution charged Mr. Martinez with first-degree, knowing murder of a child, which is a class-1 felony under C.R.S. § 18-6-401(7)(c).  Thus, an important question for the jury's resolution is what mental state Mr. Martinez acted with.  If he acted knowingly, then he would likely be guilty as charged and, pursuant to statute, receive a sentence of life in prison without possibility of parole.  To act with a knowing mental state, an actor must be "aware" of his conduct, and also "aware" that his actions are "practically certain" to cause the proscribed result (fatality, in this case).  *See* § 18-1-501(6), C.R.S. (2000).  If, however, he acted with a reckless or criminally negligent mental state, then he would be guilty of a lesser offense.  To act

4

with a "reckless" mental state, an actor must consciously disregard a substantial and unjustifiable risk that a result will occur or that a circumstance will exist. *See* § 18-1-501(8).

Wanting to convict Mr. Martinez of the gravest charge in the books, the prosecutor argued to jurors that Mr. Martinez killed Heather with a "knowing" mental state. In hopes of supporting this theory, the prosecution reminded jurors that Mr. Martinez, in statements to authorities, had initially misrepresented and minimized the degree of his misconduct.(v10, 687-90; 697-99; 740-45) The prosecution also presented testimony that historically Mr. Martinez had become frustrated when Heather would cry. When she cried, he sometimes called her a "cry baby" or "llorona" (Spanish for "cry-baby").

The only other important evidence presented by the prosecution was the testimony of two expert witnesses. The first was Dr. Martin, a deputy coroner who reiterated her opinion expressed in the autopsy report that Heather died due to complications arising from blunt head trauma, caused by at least one impact blow to the head.(v8, 462, 467; People's Ex. 32) In Dr. Martin's opinion, there was one and only one such blow.(v8, 515) It resulted in a skull fracture of the lower region at the back of Heather's head.(v8, 469)

Dr. Martin further testified that Heather sustained a non-linear fracture, and that a non-linear fracture usually suggests a more forceful blow than a linear fracture.(v8, 484-85, 497-98) However, Dr. Martin also reports that the fracture was primarily linear, with only a slight degree of variation.(v8, 503; People's Ex. 32) Moreover, an infant's skull is significantly softer and easier to injure than that of an older child or an adult.(v8, 503)

It is difficult, according to Dr. Martin, to tell whether some of Heather's injuries are attributable to the impact blow or to acceleration-deceleration forces.(v8, 489)

5

Although it takes "violent" back-and-forth shaking to produce SBS or the injuries observed in Heather, according to Dr. Martin, there is no identifiable quantum of force or shaking that is necessary.(v8, 492)  Two or four forceful shakes could have been sufficient.(v4, 504)  A shaking injury can be produced in just seconds.(v8, 504)

After this testimony from the deputy coroner, the prosecution presented Dr. Rosquist as an expert witness.  Dr. Rosquist is a pediatrician with purported expertise in child abuse.(v9, 615, 617)  Her testimony is based on her review of Dr. Martin's autopsy report.(v9, 618)  Dr. Rosquist concludes that Heather died of shaken baby syndrome.(v9, 651)  She, too, explained SBS to the jury, in a way which was generally consistent with Dr. Martin's explanation.(v9, 622-24)  Dr. Rosquist noted that the "subdural" hematoma sustained by Heather requires more force to produce than an "epidural" hematoma.(v9, 629-30)

However, Dr. Rosquist, like Dr. Martin, was unable to state what minimum degree of force or shaking necessary to produce SBS or the injuries sustained by Heather.(v9, 645)

Dr. Rosquist appeared to be hesitant to admit that, because infants are not physically developed, SBS can be caused by relatively gentle or minor shaking.(v9, 640-45)  Yet, Dr. Rosquist travels about, teaching people how to prevent SBS.(v9, 641)  The implication is that many people, in fact, do not intuitively understand how vulnerable infants are to shaking injuries. That is, someone could produce SBS without being "aware," at the time, that their conduct was "practically certain" to result in the infant's death.

Moreover, the 911 operator who fielded Mr. Martinez' emergency call asked, "<u>Did you do any shaking at all</u>?"(People's Ex. 5, at p. 5)  From this and other evidence, it appears medical professionals are more effusive and liberal when discussing what small degrees of force can cause SBS when the goal is "prevention," and less so when the goal is convicting and punishing.

In one of her more candid moments, however, Dr. Rosquist admitted that if a parent were to tell her that he had merely "shaken" a baby, she would conduct a CT scan forthwith.(v9, 644)

The complex of brain injuries identified as shaken baby syndrome, according to Dr. Martin and Dr. Rosquist, can be fatal but is not always. About 33 percent of SBS cases prove fatal, while the remaining two thirds of victims suffer neurological disorders that range in severity.(v8, 508; v9, 651)

Yet, neither doctor mentioned any way in which a person who causes SBS could know, at the time of his acts, whether the results would be fatal versus non-fatal.

## SUMMARY OF THE ARGUMENT

I.      Whether the district court violated Mr. Martinez' constitutional right to a fair trial and reversibly erred by permitting expert testimony concerning "known fact patterns" in which subdural hematomas have been caused by falls from multi-story buildings or high-speed automobile collisions, as proof that Mr. Martinez used such a degree of force and thus caused Heather's death knowingly?

II.     Whether the prosecution's intentional and cynical use of inconsistent positions to manipulate the trial violated Mr. Martinez' constitutional right to due process and a fair trial?

III.    Whether C.R.S. section 18-6-401 violates the constitutional guarantee of equal protection by establishing disparate class-1 and class-2 felony punishments for identically situated offenders, based on the purely nominal "position of trust" distinction?

IV.     Whether, assuming *arguendo* that the General Assembly does not violate equal protection guarantee by predicating disparate punishments on the purely nominal "position of trust" distinction, the General Assembly violates equal protection by predicating disparate punishments on the basis of an irrational and impermissible distinction between different classes of children?

7

## ARGUMENT

**I.    THE DISTRICT COURT VIOLATED MR. MARTINEZ' CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND REVERSIBLY ERRED BY PERMITTING EXPERT TESTIMONY CONCERNING "KNOWN FACT PATTERNS" IN WHICH SUBDURAL HEMATOMAS HAVE BEEN CAUSED BY FALLS FROM MULTI-STORY BUILDINGS OR HIGH-SPEED AUTOMOBILE ACCIDENTS, AS PROOF THAT MR. MARTINEZ USED SUCH A DEGREE OF FORCE AND THUS CAUSED HEATHER'S DEATH KNOWINGLY.**

### A.    Pertinent facts:

In this trial, jurors were called to resolve only one contested issue:  Did Mr. Martinez commit first-degree murder by causing Heather's death "knowingly," *i.e.*, with "awareness" of his conduct and of the fact that Heather's death was "practically certain to result," or did he act with another, less culpable mental state.  *See* § 18-6-401(7)(c) (defining "knowingly" as the culpable mental state for first-degree murder of a child); 18-1-501(3) (defining the mental state of "knowingly").

At trial, defense counsel made consistent efforts to prevent expert witnesses in "the child abuse Mafia," as Judge Spriggs calls them, from testifying that subdural hematomas can be caused by force akin to that which occurs when children are involved in high-speed automobile accidents or are thrown from  the window of multi-story buildings.(v8, 492-94; v9, 624)

The prosecution first signaled its intent to elicit such testimony when the deputy coroner, Dr. Martin, explained that shaken baby syndrome is a form of whiplash that occurs as the result of sudden acceleration and deceleration.  The prosecution asked, "What -- is there any other sort of real world event that you can say is the kind of event where a child would suffer these sorts of injuries?"(v8, 492)

Defense counsel objected and, during a side-bar conference, informed the court that the anticipated answer to such a question would be irrelevant and misleading.(v8, 492-94)  The

8

prosecutor offered that the "literature" pertaining to fatal head injuries contains references to falls from seven-story buildings and high-speed car accidents.(v8, 494)  Such testimony, argued the prosecution, would show jurors "the sort of impact we're talking about" in Mr. Martinez' case.(v8, 494)  The district court sustained defense counsel's objection as to the form of the question.(v8, 495)  When the prosecution again sought to elicit such testimony through Dr. Martin, however, the court sustained Mr. Martinez' objection outright.(v8, 496)

The prosecution attempted to introduce such testimony yet again, however, through Dr. Rosquist.  Dr. Rosquist was qualified as an expert in pediatrics and child abuse.(v9, 615-17) Rosquist was never offered, nor was she qualified by the court, as an expert in pathology.

During examination by the prosecution, Dr. Rosquist commenced to tell juries that there "are several examples of witnessed accidents, for example, in the medical literature which talks about --"(v9, 624)  At this defense counsel interposed an objection.(v9, 624)  In response to the objection, the court held another side-bar conference.  Again the prosecution referred to incidents in medical literature where children had sustained subdural hematomas when they were involved in high-speed automobile collisions or falls from tall buildings.(v9, 624-25)  Such examples, argued the prosecution, were necessary to depict the degree of violent force that Mr. Martinez must have employed to cause Heather's injuries.(v9, 624-25)  "[S]o it may seem shocking," conceded the prosecution, "but that is the way of the world, and that is what causes these sort of injuries."(v9, 625)

Without making factual or legal findings, the district court overruled Mr. Martinez' objection.(v9, 625) As a result, the prosecution engaged in the following examination:

> Q.    (By the prosecutor) Doctor, you were talking about the sort of mechanisms that can cause this.  You have said violent and you have said massive.  Let's talk about the kind of force we're talking about.  Are there studies

and are there known fact patterns that have caused this sort of injury [subdural hematoma]?

> A.    Yes.

> Q.    What sort of known fact patterns in the studies have you talked about?

> A.    In talking about how much force that it requires to cause this kind of injury, we can't take babies and shake them and do that for the obvious reason, so what we have had to do is take -- there have been multiple studies of series of witnessed falls or witnessed accidents where babies have had similar kinds of injuries. Okay? And in those studies, babies who had similar kinds of injuries, the subdural hematoma, have been things like a fall from a multiple story building. Being in a high speed motor vehicle accident either as a pedestrian hit by a high speed motor vehicle or, for example, an unrestrained passenger in a high speed motor vehicle accident, so those are the kinds of witnessed injuries that can lead to a similar sort of injury.

(v9, 626) (Emphasis added.)

In closing arguments, the prosecutor capitalized on the challenged testimony, by urging jurors to infer that Mr. Martinez knowingly used "massive" and "immense" force against Heather, and thus that he was practically certain, when he acted, that her death would result.(v10, 684-701, 728-46) Imperiously, the prosecution argued to jurors:

> Subdural is what Heather suffered. Subdural, sudden onset. The sudden onset. The death caused by a subdural hematoma. It is subdural hematoma that comes from this sort of action. That is what killed her. And that is what Dr. Rosquist talked about. She said violence, massive injury. How do you say that? How do you get up and say violent? What does that mean? What does that mean to a doctor? That is a word we use? What is your frame of reference? Well, a frame of reference is not for shock value, but because we can't experiment on little children to find, 'Well, if I do this and that, now let's see what it did.' We can't do that.

> So, what you do is you find situations where there have been horrendous accidents. A child has fallen off a multi-story building. A child has been ejected from a wreck. They took those children and found the injuries they have. That is how we know that this is the kind of injury here that Stephen Martinez inflicted on this baby. That is what she meant by violence, and that is where you get a subdural hematoma.

10

That is what Steven Martinez did when he was alone. That is how you figure out what he was thinking and what he knew and what he had to have known. And that is why the charge fits.

. . .

Now that we know the extent of the injuries, right, the weight of the injuries, the extent of the mortal blows, and the mortal shaking, now we know the necessary force. As Dr. Rosquist told us, we know it because it's fact; it's true. It has been observed in the real world. One, we now know the necessary force that takes us to that level of violence. The violence that must be exerted to exert that kind of force on the back of the child's head. Okay? And now we know the level of violence; we know his true actions. What did he have to have done? What did he have to do? And if he was doing that, he had to have known what he was doing, and he had to have known what it was going to do to her. It is inescapable to conclude otherwise.

(v10, 730-31, 733)

### B. Application to the law:

*1.    The court erred by admitting the challenged testimony.*

The district court violated Mr. Martinez' right to a fair jury trial, and reversibly erred, by overruling his objection to evidence of "known fact patterns" in which subdural hematomas have been caused by high-speed auto accidents or falls from the multi-story buildings. Such evidence was irrelevant, inflammatory, and highly misleading to the jury on the central issue of the case.

"In general, all relevant evidence is admissible." *Schultz v. Wells*, ___ P.3d ___ (Colo. App. 17, 2000) (*citing* CRE 402). "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401; *accord Schultz, supra*. Relevant evidence must be excluded, however, if "it's probative value is substantially outweighed by the danger of unfair prejudice." CRE 403; *People v. Quintana*, 665 P.2d 605 (Colo. 1983); *Schultz, supra*.

CRE 702, which governs the admission of expert evidence, provides that:

11

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Courts and commentators considering the parameters of permissible expert testimony have observed that there is a close relationship between Rule 702 and Rules 401, 402, and 403, which pertain to relevance and probative value. *E.g. Salcedo v. People*, ___ P.2d ___ (Colo. 2000) (stating that these Rules are "inherently intertwined"); *Schultz, supra.*

Thus, in determining pursuant to Rule 702 whether specialized or scientific knowledge would assist the trier of fact, "the trial court must consider both whether the proposed testimony would be logically relevant and whether its probative value would not be 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury . . ." *Salcedo, supra* (*quoting* CRE 403).

The trial court's duty to examine the proposed testimony for relevance and probative value has been described by the United States Supreme Court as a "gate-keeping" function. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). A trial court performs the gate-keeping function be excluding any proffered expert testimony unless the testimony is both, (1) relevant and, (2) reliable. *Kumho*, 526 U.S. at 141. Rule 702's mandate of relevance and reliability "requires a valid . . . connection to the pertinent inquiry as a precondition of admissibility." *Id.* at 149.

In this case, the district court reversed its earlier ruling and overruled defense counsel's objection without making any findings of fact or law to support its ruling. The ruling is erroneous. The district court should have excluded the challenged testimony, because there is no valid connection from such testimony to any pertinent inquiry. That is, with respect to this case,

12

when he caused Heather's subdural hematoma. Her testimony about tall buildings and high-speed auto collisions is simply unreliable as a gage of Mr. Martinez' conduct. The district court was mistaken to admit such testimony.

A closely analogous case is *Schultz v. Wells, supra*. That case involved an automobile collision. The defendant, whom the plaintiff sued for liability, theorized that there is a threshold force level below which a person cannot be injured in a rear-end automobile collision. The defendant sought to introduce an expert witness who would testify that the plaintiff could not have sustained bodily injury in an automobile collision at the vehicular speeds in question.

Such a theory parallels the prosecution's theory in Mr. Martinez' case that there is a threshold force level below which an infant could not sustain a subdural hematoma.

In *Schultz*, the proposed evidence of threshold force/injury test results was excludable, held the Court of Appeals, because the evidence was "inadequate for the purpose for which [it was] offered." The test results were excludable, in other words, because they "could not be used to prove that a particular person was not injured or was likely not injured in this accident." *Id.* (internal punctuation omitted).

We have seen above why Dr. Rosquist's testimony concerning "known fact patterns" in which children have received subdural hematomas is logically incapable of assisting jurors to reliably determine the degree of force used by Mr. Martinez. The lack of nexus or connection between such testimony and a pertinent issue in the case is still further demonstrated, and amplified, when the evidence is exposed to the multi-part test for admissibility employed in *Schultz*.

Citing the United States Supreme Court's holding in *Kumho Tire, supra*, the Court of Appeals in *Schultz* employed a multi-part balancing test. The Court of Appeals held that to

14

resolve the admissibility of scientific or specialized knowledge under CRE 702, a trial judge should consider, (1) the testability of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence or nonexistence of maintained standards; and (5) whether the theory or technique has general acceptance in the relevant scientific community. Such a multi-part inquiry is designed to screen proffered evidence for relevance and reliability.

Addressing the facts in *Schultz*, the Court of Appeals noted that the proffered test results were found by the trial court to have been "confusing and misleading to the jury"; that the circumstances of the tests did not correspond with the circumstances of the case at issue; that the statistical sample taken was extremely low; that the tests were conceived and conducted for purposes other than measurement of thresholds of force and injury; that the experiments did not feature scientific controls; and that there was no general acceptance in the engineering profession of the underlying theory or techniques behind the tests. This combination of shortcomings rendered the proffered evidence irrelevant, unreliable, and thus inadmissible. *Id.*

In Mr. Martinez' case, the district court failed to conduct the multi-part inquiry mandated by *Schultz*, *Kumho*, and other authorities. Had the court done so, the shortcomings of the evidence would have been easily exposed. The prosecution and Dr. Rosquist both acknowledged that there is in fact no theory or technique through which to quantify the threshold level of force necessary to cause a subdural hematoma.(v9, 624, 626) They also acknowledged that it is impossible to quantify the number of blows necessary to cause such an injury.(v9, 637, 645) Dr. Rosquist stated, moreover, that such injuries feature a 33 percent mortality rate, but she did not provide any theoretical basis to identify fatal versus non-fatal degrees of force.(v9, 651) Naturally, there being no theory or technique by which to quantify or differentiate threshold

15

levels of fatal and non-fatal force, the inferences peddled by the prosecution through Dr. Rosquist cannot be supported by peer review, nor could such non-existent theories have acceptance within the scientific community. Still further, no one could suggest that the inferences from such non-existent theories could be measured, checked or controlled against any known potential rate of error. As such, the district court should have excluded the evidence under CRE 702, CRE 401, and CRE 403 because it was neither relevant nor reliable.

Furthermore, and by the prosecution's own admission, the evidence was highly inflammatory. The prosecution volunteered at the side-bar conference that the challenged evidence and theory "may seem shocking." Later, in arguments to the jury the prosecution acknowledged the evidence features "shock value."

Indeed it is shocking, first to think that a human being could even generate the type of "massive" and "immense" physical forces associated with high-speed automobile collisions or falls from the rooftop; and second, to think that any human being would consciously employ such brutal force against an innocent baby. At first the mind struggles to conceive such an awful image, and then the mind is enslaved to it.

Where, as here, such a conjured image was unfounded in scientific or specialized, reliable knowledge, its non-existent probative value was very obviously outweighed by the danger it presented of unfair prejudice. Thus, the district court should have excluded the challenged evidence under CRE 401 and CRE 403, as well as CRE 702.

> 2.    *The error was extraordinarily prejudicial, and thus reversible.*

Erroneous rulings pertaining to state evidentiary rules can rise to the level of a due process violation. *Montana v. Egelhoff,* 518 U.S. 37 (1996); *U.S. Const.* Amends. V, XIV; *Colo. Const.* Art. II, § 25. Constitutional error is reversible unless a careful scrutiny of the entire

16

record compels the conclusion that the error was harmless beyond a reasonable doubt. *See e.g.*
*Arizona v. Fulminante*, 499 U.S. 279 (1991); *Blecha v. People*, 962 P.2d 931 (Colo. 1998). "If
there is a reasonable possibility that the constitutional error might have contributed to the
conviction, the error cannot be viewed as harmless." *People v. Nord*, 790 P.2d 311, 318 (Colo.
1990) (*citing Chapman v. California*, 386 U.S. 18 (1966)). Furthermore:

> Harmless-error review looks . . . to the basis on which 'the jury actually rested its
> verdict. The inquiry, in other words, is not whether, in a trial that occurred
> without the error, a guilty verdict would have been rendered, but whether the
> guilty verdict actually rendered in this trial was surely unattributable to the error.'

*Blecha v. People, supra* (*quoting Sullivan v. Louisiana*, 508 U.S. 275 (1993)).

In this case, by wrongly admitting evidence irrelevant and unreliable as well as
extraordinarily and unfairly prejudicial, the district court violated Mr. Martinez' rights to a fair
trial and to due process. Moreover, because the jury's decision to convict of first-degree murder
is not "surely unattributable to the error," the error is not harmless beyond a reasonable doubt.

The prosecution made three separate attempts to introduce the evidence in question, two
of which occurred following adverse rulings by the court. At closing argument, the prosecution
twice referred to the evidence explicitly and discussed it passionately and at length. The
prosecution's repeated efforts to introduce the evidence and to argue its implications to the jury
are indicative of its high value to the prosecution. *See Blecha, supra* (finding the absence of
reference by the prosecutor to unconstitutional evidence during closing arguments an indicator
that the error was harmless beyond a reasonable doubt).

Moreover, the evidence was uniquely bracing and alluring to the jury. Dr. Rosquist's
testimony concerning the forces associated with pedestrians, high-speed automobile collisions
and with falls from multi-story buildings was not merely "shocking," as the prosecution
observed; it was also a vital and substantive component in the prosecution's theory of the case.

Through the unfounded supposition that Mr. Martinez must have used the "massive" and "immense" degree of force associated with high-speed collisions and falls from the rooftop, jurors were encouraged to conclude that he could not have failed to be aware that his actions would have a fatal result. Once the ill-founded supposition of "massive" and "immense" violent force is accepted, the prosecution's argument becomes compelling, and jurors cannot be supposed to have ignored it in reaching their verdict. If indeed Mr. Martinez generated against Heather the gruesome force of a high-speed automobile accident, *etc.*, then he may well have killed knowingly. However, the tendency of the contested evidence to promote an unfounded inference that Mr. Martinez did use such gruesome force is precisely what caused him such an extreme degree of unfair prejudice at this trial.

Without the challenged evidence, moreover, there would have been little if any reason for jurors to think that Mr. Martinez generated and used such extreme force against Heather. To begin with, he is a man without a criminal history. There is no evidence to suggest that Mr. Martinez is malevolent, diabolical or sadistic. Rather, the prosecution theorizes that Mr. Martinez acted from a sudden boiling frustration when Heather cried. The prosecution expressly admitted that Mr. Martinez did not likely hold a subjective desire to kill Heather.(v7, 251) Under these circumstances and others, jurors had no compelling reason (absent Dr. Rosquist's testimony) to expect that Mr. Martinez would have acted with such a gruesome degree of force, or with awareness that Heather's death was practically certain.

In this case, therefore, the jury may well have actually rested its verdict upon consideration of the challenged evidence. The verdict reached by this jury was not "surely unattributable" to Dr. Rosquist's testimony and the prosecution's misleading, inflammatory

18

arguments.   Accordingly, the district court reversibly erred.   This court should reverse Mr. Martinez' conviction and remand his case for a new trial.

## II.    THE    PROSECUTION'S    INTENTIONAL    AND    CYNICAL    USE    OF INCONSISTENT POSITIONS TO MANIPULATE THE TRIAL VIOLATED MR. MARTINEZ' CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.

The prosecution charged Mr. Martinez with first-degree, knowing murder of a child, which is a class-1 felony and thus the gravest offense on the books.   Even from the most incipient stages of the police investigation, government officials were cognizant that Mr. Martinez could and likely would be so charged.(People's Ex. 36, at p. 54)

During a videotaped custodial interrogation, Detective Moss informed Mr. Martinez that, (1) the case would be submitted to the prosecutor; (2) the prosecutor would elect whether to charge the offense as either first-degree murder or some lesser offense including misdemeanor child abuse; (3) the case would likely go to trial; and (4) the videotaped interrogation would in fact be played for the jury; (5) adults who are not experienced in child rearing can accidentally and unknowingly cause shaken baby syndrome through minor shaking; (6) authorities are capable of scientifically deducing the extent of force used against Heather, and "science doesn't lie"; (7) he, the detective, had reviewed the applicable "science" with the deputy coroner; (8) Mr. Martinez' physical demonstration of shaking was consistent with an "accidental" killing of Heather;   and   (9) the type of shaking Mr. Martinez exhibited during the interrogation was sufficient to cause Heather's death.(People's Ex. 36, pp. 45-88)

At trial, at least some of these representations proved true:  Mr. Martinez was charged with first-degree, knowing murder, and the videotape was played for the jury.

By contrast, the prosecution presented witnesses and argument in support of its theory that the subdural hematoma received by Heather requires "massive" and "immense" physical

19

brutality; that such an injury cannot be produced accidentally; and that Mr. Martinez' demonstration of shaking was not sufficient to cause Heather's death.(v8, 499 ; v9, 634; v10, 687-703; 731-47)  Moreover, the prosecution relied on the videotaped inteorrogation to argue, passionately, that Mr. Martinez' misrepresentation of the degree of force used was an obvious and ugly lie, a lie that is itself indicative of his venal heart and base criminal intent at the time of the offense.(v10, 687-703; 731-47)

Our system of justice cannot permit the prosecuting authority to make such conscious and brazen inconsistent representations in order to manipulate the evidence and the verdict of the jury.  In a criminal case, the prosecutor "is not an ordinary party to a controversy, but is a 'servant of the law' with a 'twofold aim . . . that guilt shall not escape or innocence suffer.'" *Singer v. United States,* 380 U.S. 24, 37 (1965).  The duty of the prosecutor, as a servant of the law, is to seek justice, not merely to convict. *See People v. District Court,* 632 P.2d 1022 (Colo. 1981); *People v. Drake,* 841 P.2d 364 (Colo. App. 1992); ABA, *Standards For Criminal Justice,* (3rd ed. 1993), Standard. 3-12(c) ("The duty of the prosecutor is to seek justice, not merely to convict.").  Our justice system suffers and ultimately fails when any accused is treated unfairly. *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  The prosecutor therefore may not become "the architect of a proceeding that does not comport with the standards of justice." *Id.*

The prosecution's conduct in this case is analogous to cases where the prosecutor has presented differing theories of prosecution at trials of co-defendants, a tactic that has been roundly condemned as antithetical to the proper scope of the prosecutorial function. *See, e.g., Drake v. Kemp,* 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) ("Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth.").  To comport with principles of due process and fundamental fairness, a prosecutor may not, as

20

happened here, talk out of both sides of his mouth. *See Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997), *rev'd. on other grounds, Calderon v. Thompson*, 523 U..S. 538 (1998).

"The doctrine of judicial estoppel is applied to prevent a prevailing party, as a matter of law, from adopting a legal position which conflicts with an earlier position taken in the same or related litigation." *Farmers High Line Canal v. City of Golden*, 975 P.2d 189, 201-202 (Colo. 1999); *see Estate of Burford v. Burford*, 935 P.2d 943, 948 (Colo. 1997). The five prerequisites for the application of the doctrine are:

- the two inconsistent positions must be taken by the same party or parties in privity with each other;
- the positions must be taken in the same or related proceedings involving the same parties or parties in privity with each other;
- the party taking the two contrary positions must have been successful in maintaining the first position and must have received some benefit in the prior proceeding;
- the inconsistency must be part of an intentional effort to mislead the court; and
- the two positions must be totally inconsistent, that is, the truth of one position must necessarily preclude the truth of the other position

*See Farmers, supra*, 975 P.2d at 202; *Burford, supra*, 935 P.2d at 948; *Lyons Savings v. Dire's Lock*, 885 P.2d 345 (Colo. App. 1994).

All of the five requirements are met on these facts. The state's bad faith manipulation of the case presented to the jury requires reversal of Mr. Martinez's convictions. *U.S. Const.* Amends. V, XIV; *Colo. Const.* Art. II, § 25.

## III.   C.R.S. SECTION 18-6-401 VIOLATES THE CONSTITUTIONAL GUARANTEE OF EQUAL PROTECTION BY ESTABLISHING DISPARATE CLASS-1 AND CLASS-2 PUNISHMENTS FOR IDENTICALLY SITUATED OFFENDERS, BASED ON THE PURELY NOMINAL DISTINCTION OF "POSITION OF TRUST" STATUS.

Equal protection is guaranteed by the fourteenth amendment to the U.S. Constitution and by the due process clause in article II, section 25, of the Colorado Constitution. "Equal protection of the laws assures like treatment of all those who are similarly situated." *People v.*

21

*Mozee*, 723 P.2d 117, 126 (Colo. 1986); *accord People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316, 318 (1975). Thus, "[w]hen two criminal statutes prescribe different penalties for identical conduct, a defendant convicted and sentenced under the harsher statute is denied equal protection of the laws." *Mozee*, 723 P.2d at 126; *People v. Haymaker*, 716 P.2d 110 (Colo. 1986).

Furthermore, distinctions between statutory classifications that are merely nominal do not justify disparate punishments. To comport with the Constitution, "statutory classifications of crimes must be based on differences that are real in fact and reasonably related to the purposes of the legislative enactments." *People v. Wilhem*, 676 P.2d 702, 704 (Colo. 1984); *accord People v. Nguyen*, 900 P.2d 37 (Colo. 1995); *People v. Marcy*, 628 P.2d 69 (Colo. 1981); *People v. Stewart*, ___ P.2d ___ (Colo. App. June 22, 2000), *cross-petitions for certiorari pending*.

In Mr. Martinez' case, he challenged the statutory arrangement under which has been charged and now convicted, on grounds of equal protection. Specifically, he asserted that his conviction for conduct defined in C.R.S. § 18-3-102(1)(f) violates equal protection because it carries a class-1 felony punishment that is harsher than the class-2 punishment applicable to similarly situated offenders pursuant to C.R.S. § 18-6-401.(v5, 9-17; v6, 1-3)  Mr. Martinez informed the court that nominal distinctions in the conduct designated as class-1 and class-2 child abuse resulting in death are not real and rationally related to legitimate legislative interests. The district court overruled his objection.(v6, 1-3)  This was error.

### A.    The Statutory Offenses And The Disparate Punishments:

In a section of code dealing with "wrongs to children," the General Assembly provides:

> **18-6-401. Child abuse.** (1) (a) A person commits child abuse if such person causes an injury to the child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or

22

an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

   . . .

   (7) (a)  <u>Where death or injury results, the following shall apply:</u>

   <u>(I)  When a person acts knowingly or recklessly and the child abuse results in death to the child, it is a class 2 felony except as provided in paragraph (c) of this subsection (7).</u>

   . . .

   (c)  <u>When a person knowingly causes the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the child, such person commits the crime of murder in the first degree as described in section 18-3-102(1)(f).</u>[2]

(Emphasis added.)

Thus, in subsections (7)(a)(I) and (7)(c) of the statute, the General Assembly establishes separate offenses, with the former punished as a class-2 felony, and the latter as a class-1 felony.

This scheme violates the equal protection guarantee, however, because it prescribes differing penalties for identical conduct.  Consider a person who has:

- been charged with a duty to care for a child less than 12 years old, and
- through abuse of that child and the duty of care,
- knowingly
- caused
- the child's death

Pursuant to section 18-6-401, this specific conduct is proscribed as both a class-2 felony, pursuant to subsection 18-6-401(7)(a)(I), and a class-1 felony, pursuant to subsection 18-6-401(7)(c).  To see this, one need only observe that there is a purely nominal distinction between the element of a "position of trust" that supports a class-1 conviction under subsection 18-6-

---

[2] In subsection 18-3-102(1)(f), the General Assembly simultaneously defines as first degree murder the act of knowingly killing a child under the age of 12, while in a position of trust.

23

401(7)(c), and the means by which one commits "child abuse" so as to permit a class-2 felony conviction pursuant to subsection 18-6-401(7)(a)(I).

One who has knowingly caused the death of a child who has not yet attained the age of 12 cannot be convicted of a class-1 felony pursuant to subsection 18-6-401(7)(c), unless one has done so while "in a position of trust with respect to the child." The "position of trust" element is thus a *sine qua non* to a class-1 felony conviction. It serves as the statutory threshold which divides otherwise identically situated actors in to class-1 and class-2 offenders.

The "position of trust" *sine qua non*, however, creates between otherwise identically situated actors a distinction without a difference. A "position of trust" is defined in the following way:

> (3.5) One in a "position of trust" includes, but is not limited to, any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties, or responsibilities concerning a child, including a guardian or someone otherwise responsible for the general supervision of a child's welfare, or a person who is charged with any duty or responsibility for the health, education, welfare, or supervision of a child, including foster care, child care, family care, or institutional care, either independently or through another, no matter how brief, at the time of an unlawful act.

§ 18-3-401(3.5), C.R.S. (2000).

This is obviously a broad definition, which identifies virtually anyone who holds, however momentarily, a duty of care and supervision toward a child.

At the same time, as the "child abuse" statute quoted above indicates, a person commits the class-2 offense specified in subsection 18-6-401(7)(a)(I), if one knowingly (or recklessly) causes the death of a child (including a child under 12) through any of the following means:

24

such person causes an injury to the child's life or health, or <u>permits</u> a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or <u>engages in a continued pattern of conduct</u> that results in <u>malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries</u> that ultimately results in the death of a child or serious bodily injury to a child.

§ 18-6-401(1)(a) (emphasis added).

Each of the forms of misconduct described in this subsection reflects an abuse of the duty of care and supervision toward a child.  One thus cannot commit class-2 "child abuse" resulting in death pursuant to subsection 18-6-401(7)(a)(I) without first having a duty of care and supervision toward a child.  In turn, one cannot commit child abuse resulting in death as described in subsection 18-6-401(7)(a)(I) without, for all purposes real and practical, having done so while "in a position of trust with respect to the child."

As such, this statutory scheme violates the equal protection guarantee, for disparate penalties designated by the legislature must be based on differences that are real in fact and are reasonably related to the purposes of the legislation.  *Nguyen, supra*; *Wilhelm, supra*; *Marcy, supra*; *Stewart, supra.*

Because the General Assembly has violated the constitutional guarantee of equal protection by creating a purely nominal condition that raises a class-2 felony to a class-1 felony, the correct remedy is to reduce the level of Mr. Martinez' conviction to a class-2 felony, and remand his case for a new sentencing hearing. *See e.g. Nguyen, supra.*

25

IV.    ASSUMING *ARGUENDO* THAT THE GENERAL ASSEMBLY DOES NOT VIOLATE EQUAL PROTECTION GUARANTEE BY PREDICATING DISPARATE PUNISHMENTS ON THE PURELY NOMINAL "POSITION OF TRUST" DISTINCTION, THE GENERAL ASSEMBLY VIOLATES EQUAL PROTECTION BY PREDICATING DISPARATE PUNISHMENTS ON THE BASIS OF AN IRRATIONAL AND IMPERMISSIBLE DISTINCTION BETWEEN DIFFERENT CLASSES OF CHILDREN.

The Fourteenth Amendment to the United States Constitution provides:  "[N]or shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)  In Colorado, the General Assembly has chosen to enact legislation which does just that.  Through the child abuse statute at C.R.S. § 18-6-401(7)(a)(I) and (7)(c), the General Assembly declares that the knowing murder of a child aged 12 to 18 years is a class-2 felony, while the knowing murder of a child aged less than 12 is a class-1 felony.  This is a declaration that the life of a young child is more protected and valued by the State than the life of an older child.  Disparate punishments predicated on such a thesis cannot stand.

The General Assembly may establish harsher penalties for acts believed to have graver consequences.  *People v. Haymaker*, 716 P.2d110, 118 (Colo. 1986).  However, a criminal offense featuring neither consequences nor a culpable intent that is more grave than another offense may not be punished more severely.  *People v. Suazo*, 867 P.2d 161, 164 (Colo. App. 1993).

Certainly the consequence of murder against a person from one class cannot be deemed by the law to be more grave than the consequence of murder against a person from a different class.  The very essence of the equal-protection guarantee is that distinctions between classes of

26

citizens cannot be predicated on mere animosity or veneration of different classes. *See Romer v. Evans*, 517 U.S. 620 (1996).

Imagine, for example, if the General Assembly were to declare it a class-2 felony to kill a black person, and a class-1 felony to kill a white person. This would be a declaration that the State considers the murder of a white person more consequential than the murder of a black person. Such a law would be a flagrant and unmitigated outrage. It could not possibly survive a challenge under the Equal Protection Clause of either the U.S. or Colorado Constitutions. This, moreover, is not solely due to the fact that race-based classifications are subject to "strict scrutiny." The affront to the principle of equal protection posed by such a statutory scheme would be patent and intuitive, existing not because of legal stricture but because it is simply understood that, at the fundamental level of life and death, political states may not discriminate.

In *Romer v. Evans, supra*, the U.S. Supreme Court struck down a state constitutional amendment that prohibited state or local governments from enacting laws to provide special legal protection for people of homosexual orientation. Without declaring that homosexuals constitute a specially protected class of citizens who are entitled to the benefit of "strict" or "intermediate" scrutiny in an equal protection analysis, the Supreme Court found the law unconstitutional because it was based on animosity toward the class. The Court declared that laws based on mere animosity or veneration of different classes cannot withstand even the most deferential form of "rational basis" scrutiny.

Thus, with respect to the legislative scheme here in question, the veneration that legislators may hold for the innocence of small children does not bear a rational relationship to any legitimate governmental interest so as to justify the disparate punishments declared in subsections 18-6-401(7)(a)(I) and (7)(c).

27

Similarly, the culpable intent encompassed by both subsections 18-6-401(7)(a)(I) and (7)(c) is identical. Both offenses punish persons who have acted with the "knowing" culpable mental state. What is more, it cannot possibly be a less culpable act to kill an older child than an infant or a small child. By virtue of an older child's increased size, strength and learning, an act of fatal mistreatment against an older child necessarily requires a much greater degree of force or dereliction than an act of fatal mistreatment against an infant or young child. Under these circumstances, it would be irrational to posit that fatal acts against a young child are more egregious than those against an older child.

Thus, neither the culpable intent nor the consequences of the conduct proscribed by subsections 18-6-401(7)(a)(I) and (7)(c) are disparate, and the disparate punishments prescribed by the General Assembly are violative of the equal protection guarantee. *See Suazo, supra.*

Even assuming, *arguendo*, that factors beside the culpable mental state and consequences of offenses could be used as a predicate for disparate punishments, there is no rational policy basis to support the disparate punishments here.

Aside from the sentimental esteem that elected officials hold for infants and small children, there is no legitimate policy reason for using homicide statutes to discriminate between classes of children. On the contrary, when the State enacts homicide laws for the protection of life, it is *in loco parentis* to all children in Colorado. A "child" is defined in Colorado's "Children's' Code" as "a person under eighteen years of age." § 19-1-103(18), C.R.S. (2000). "Child abuse" refers to acts of abuse or neglect that threaten the health or welfare of any child. § 19-1-103(1) & (19) (emphasis added).

Because the General Assembly has violated the constitutional guarantee of equal protection by predicating disparate punishments on an irrational and impermissible distinction

28

between classes of children, the correct remedy is to reduce the level of Mr. Martinez' conviction and to a class-2 felony, and remand his case for a new sentencing hearing. *People v. Nguyen*, 900 P.2d 37 (Colo. 1995).

## CONCLUSION

For the foregoing reasons, Mr. Martinez respectfully requests that this court reverse the judgment of conviction and sentence and remand for further proceedings.

DAVID S. KAPLAN
Colorado State Public Defender

JAMES GRIMALDI, #24893
Deputy State Public Defender
Attorneys for Stephen Martinez
110 Sixteenth Street, Suite 800
Denver, Colorado 80202
(303) 620-4888

## CERTIFICATE OF SERVICE

I certify that, on February 20, 2001, a copy of this Opening Brief of Defendant-Appellant was hand-delivered to the Colorado Court of Appeals for deposit in the Attorney General's mailbox to the attention of:

Robert M. Russel
Assistant Solicitor General
Appellate Division, Criminal Justice Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

29